## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **GURINDER JOHAL, personal representative** ) | |
| **of the Estate of AMARJEET JOHAL, and** ) | |
| **DILJOT SEKHON, personal representative** ) | |
| **of the Estate of AMARJIT SEKHON, and** ) | **Case No.: 1:23-cv=00655-TWP-MJD** |
| **JASPREET SEKHON, personal representative** ) | |
| **of the Estate of JASVINDER KAUR, and** ) | |
| **MARY "CAROL" WEISERT, personal** ) | |
| **representative of the Estate of JOHN WEISERT,** ) | **JURY TRIAL DEMANDED** |
| **MATTHEW D. ALEXANDER as the Natural** ) | |
| **Parent and Next Friend of KARLI SMITH,** ) | |
| **Deceased, and JEFF BLACKWELL and** ) | |
| **TAMMI BLACKWELL as Natural Parents** ) | |
| **and Next Friends of SAMARIA BLACKWELL,** ) | |
| **Deceased.** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **vs.** ) | |
| ) | |
| **AMERICAN TACTICAL, INC., ANTHONY** ) | |
| **DICHARIO, JOSEPH CALABRO,** ) | |
| **SCHMEISSER GMBH, and 365 PLUS** ) | |
| **D.O.O.** ) | |
| **Defendants.** ) | |

## <u>AMENDED COMPLAINT</u>

**COME NOW** Plaintiffs GURINDER JOHAL**,** as personal representative of the Estate of Amarjeet Johal, DILJOT SEKHON, as personal representative of the Estate of Amarjit Sekhon, JASPREET SEKHON**,** as personal representative of the Estate of Jasvinder Kaur, MARY "CAROL" WEISERT, as personal representative of the Estate of John Weisert, MATTHEW D. ALEXANDER as the natural parent and next friend of Karlie Smith, Deceased, and JEFF BLACKWELL and TAMMI BLACKWELL, as natural parents and next friends of Samaria Blackwell, deceased, by and through undersigned counsel, and files their Complaint for negligence, public nuisance, and unlawful marketing against Defendants American Tactical, Inc., its president Anthony DiChario, its marketing director Joseph Calabro, Schmeisser GmbH, and 365 Plus d.o.o. (collectively, the Defendants), alleging the following:

1

## INTRODUCTION

1.      "No honest man needs morethan 10 rounds," said famed firearms manufacturer and designer William B. Ruger, Sr., over 30 years ago.

2.      Ruger also stated, "I never meant for simple civilians to have my 20- or 30-round magazines"

3.      A magazine is the accessory used to store and feed ammunition in semi- automatic and automatic guns. Rounds, or cartridges, are ammunition—what contains the bullet that is fired from a gun. The high-capacity ammunition magazines (HCMs) that Mr. Ruger found unnecessary for law-abiding civilians enable many rounds to be fired from semi-automatic guns without reloading.

4.      HCMs are not necessary, or even useful, for lawful self-defense or hunting. They are, however, very useful for killing large numbers of people quickly, before the user can be stopped as he reloads.

5.      While soldiers in a combat zone may need to shoot many people quickly, HCMs in the civilian context are, as a practical matter, useful only to engage in mass assaults on other civilians or law enforcement—that is, mass shootings.

6.      This case is about what happens when companies recklessly design, market, sell, and distribute these accessories to the general public—indiscriminately—and without adherence to reasonable safeguards.

7.      While some debate the exact number of rounds beyond which an HCM becomes an unreasonably dangerous and unnecessary firearms accessory that poses an unacceptable risk to public safety relative to any nominal benefit, an HCM containing 60 rounds manifestly exceeds the threshold of unreasonableness.

8.      A 60-round HCM's meaningful utility is limited to military assaults or their civilian equivalent—mass shootings.

9.      A 60-round HCM has no use for law-abiding civilians employing fire- arms for legitimate purposes such as self-defense, hunting, or sport shooting at inanimate targets.

10.      Defendants knew that HCMs have been used repeatedly to slaughter and terrorize Americans in horrific mass shootings since long before April 2021. They knew that mass killers are attracted to HCMs, because they generate maxi- mum killing power in a very short time.

11.     Despite awareness of the above risks, Defendants deliberately marketed and sold HCMs to the general public--and not just any HCM, but 60-round magazines that have approximately six times the killing capacity of standard magazines. Defendants sold these HCMs without a single safeguard, screening, or limit. Indeed, these HCM's are available for purchase at the click of a button on the internet marketplace—where criminals flock due to anonymity and lack of reasonable controls.

12.     A company that imports, manufactures, distributes, or sells highly lethal products to civilians owes a duty to the public to be particularly careful about whose hands those products end up in.

13.     Yet Defendants, when faced with the decision to act responsibly, in- stead took a hard turn and specifically targeted these highly lethal products to a consumer base filled with impulsive young men who feel they need to harm others in order to prove their strength and who have militaristic delusions of fighting in a war or a video game—young men like the mass shooter here, who murdered eight innocent people and wounded five others in a mere four minutes (Shooter).[1]

14.     Instead of minimizing the serious risk that their HCMs would be acquired by and misused by violent criminals, Defendants breached their duty of care by significantly increasing the risk that one or more of their HCMs would be used in a mass shooting.

15.     Defendants did so through several reckless practices (described in greater depth below), including, but not limited to:

   **a.**     selling HCMs with a 60-round capacity;

   **b.**     allowing customers to acquire HCMs without providing any legitimate reason for needing an HCM for law-abiding activities;

   **c.**     allowing customers to acquire HCMs without engaging in any face-to-face transactions with any Federal Firearms Licensee (FFL);

   **d.**     allowing customers to acquire HCMs without providing their criminal history or completing a mental health screening;

   **e.**     affirmatively marketing HCMs in a manner that they knew, and intended, would target these highly lethal products to young men with delusions of

---

[1] This complaint refers to this individual in generic terms so as to avoid giving notoriety to criminals.

fighting in a war, an obsession with video games, and insecurities regarding their masculinity (*i.e.*, the need to harm others in order to prove their strength).

16.     Defendants' reckless actions directly and foreseeably channeled a 60- round HCM into the hands of the Shooter or somebody like him. The Shooter did exactly what Defendants knew or should have known one of its customers would do: he combined the HCM with an AR-15 style firearm (the Firearms)[2] to perpetrate a mass shooting. This shooting was in Indianapolis, Indiana on April 15, 2021 (the Attack).

17.     The Shooter armed himself with multiple HCMs but emptied a 60-round Schmeisser HCM (the Magazine) early in the Attack. Use of the Magazine enabled the Shooter to fire all 60 rounds in a matter of seconds.

18.     Thirteen people were shot during the Attack. Eight died.

19.     Among the victims were Amarjeet Johal, Amarjit Sekhon, Jasvinder Kaur, John Weisert, Karlie Smith, and Samaria Blackwell.

20.     Upon information and belief, Defendants continue to market and sell the Magazine and will ship it straight to anyone who can access the internet and pay $49.95 plus tax and shipping.

21.     The lethality of the Attack would not have been possible without the Magazine.

22.     The Shooter needed the HCM to accomplish his mission to kill and terrorize as many people as possible.

23.     The high capacity of the Magazine emboldened the Shooter to commit the Attack, knowing he had the ability to fire 60 rounds continuously without the need to pause to reload.

24.     Defendants not only made the Magazine easily and anonymously accessible to the Shooter, Defendants also targeted a dangerous class of individuals, which included the Shooter, with their reckless marketing campaign.

25.     Upon information and belief, the Shooter would not have selected or utilized the HCM in the attack but for the Defendants' negligent or unlawful design, marketing, or sales practices.

26.     Plaintiffs are entitled to damages for the harm foreseeably flowing from the

---

[2] Two AR-15 style rifles were recovered at the scene of the Attack.

Defendants' reckless conduct in the manufacturing and/or importing, selling, dis- tributing, and marketing of the Magazine, as well as to injunctive relief to abate the ongoing nuisance created by Defendants' continuing conduct with regards to similar 60-round HCMs.

27.     This lawsuit does not in any way challenge the right of law-abiding citizens to bear arms for self-defense.

28.     This lawsuit also does not challenge in any way the right of responsible manufacturers, distributors, and sellers of firearms or reasonable firearms accessories to conduct business while complying with all aspects of their duty of care to the public and applicable state and federal laws.

29.     Instead, it seeks only to hold the Defendants accountable for their negligent, reckless, and unlawful conduct, which foreseeably resulted in the unlawful use of its Magazine to effect mass killing.

## PARTIES

30.     At all times relevant hereto, Amarjeet Johal was a citizen of the State of Indiana.

31.     Gurinder Johal is the son of Amarjeet Johal and brings this action as the personal representative of the Estate of Amarjeet Johal to recover damages for Amarjeet Johal's wrongful death and, by the filing of this action, submits to the jurisdiction and venue of this honorable Court.

32.     At all times relevant hereto, Amarjit Sekhon was a citizen of the State of Indiana.

33.     Diljot Sekhon is the eldest son of Amarjit Sekhon and brings this action as the personal representative of the Estate of Amarjit Sekhon to recover damages for Amarjit Sekhon's wrongful death, and, by the filing of this action, submits to the jurisdiction and venue of this honorable Court. Pursuant to 28 U.S.C. § 1332(c)(2), Diljot Sekhon is deemed a citizen of the same state as his decedent, i.e., Indiana.

34.     At all times relevant hereto, Jasvinder Kaur was a citizen of the State of Indiana.

35.     Jaspreet Sekhon is the daughter of Jasvinder Kaur and brings this action as the personal representative of the Estate of Jasvinder Kaur to recover damages for Jasvinder Kaur's wrongful death, and, by the filing of this action, submits to the jurisdiction and venue of this honorable Court. Pursuant to 28 U.S.C. § 1332(c)(2), Jaspreet Sekhon is deemed a citizen of the same state as her decedent, i.e., Indiana.

36.     At all times relevant hereto, John Weisert was a citizen of the State of Indiana.

37.     Mary "Carol" Weisert is the wife of John Weisert and brings this action, as the

personal representative of the Estate of John Weisert to recover damages for John Weisert's wrongful death and, by the filing of this action, submits to the jurisdiction and venue of this honorable Court. Pursuant to 28 U.S.C. § 1332(c)(2), Mary Carol Weisert is deemed a citizen of the same state as her decedent, i.e., Indiana.

38.    At all times relevant hereto, Karlie Smith was a citizen of the State of Indiana.

39.    Matthew D. Alexander is the father of Karlie Smith, who was 19 at the time of her death, and brings this action as her natural parent and next friend to recover damages for Karlie Smith's wrongful death and by the filing of this action, submits to the jurisdiction and venue of this honorable Court. Pursuant to 28 U.S.C. § 1332(c)(2), Matthew D. Alexander is deemed a citizen of the same state as his decedent, i.e., Indiana.

40.    At all times relevant hereto, Samaria Blackwell was a citizen of the State of Indiana.

41.    Jeff Blackwell and Tammi Blackwell are the natural parents of Samaria Blackwell and bring this action to recover damages for Samaria Blackwell's wrongful death and by the filing of this action, submit to the jurisdiction and venue of this honorable Court. Pursuant to 28 U.S.C. § 1332(c)(2), Jeff Blackwell and Tammi Blackwell are deemed a citizen of the same state as their decedent, i.e., Indiana.

42.    Defendant American Tactical, Inc., (American Tactical) is a New York corporation with its principal place of business located at 231 Deming Way, Summerville, South Carolina 29483.

43.    Defendant American Tactical is an importer, manufacturer, and seller of firearms, ammunition, and accessories, including the ATI Schmeisser AR15 60 Round Magazine that was used by the Shooter in the Attack.

44.    Defendant American Tactical is the exclusive United States importer of Schmeisser magazines.

45.    Upon information and belief, Defendant American Tactical imported, marketed, distributed, and sold the Magazine, either directly or through one or more intermediaries, to the Shooter, and other similar magazines, to members of the general public.

46.    Defendant Anthony DiChario (DiChario) is the President of Defendant American Tactical. As president of American Tactical, upon information and belief, DiChario is aware of or ultimately approves American Tactical's marketing. As president, he has the ultimate authority to influence and direct American Tactical's marketing strategy and to cease running specific advertisements or other content published by American Tactical on its social media platforms.

Defendant DiChario also owns a firearms distribution company, AmChar Wholesale, Inc. (AmChar), also located at 100 Air Park Drive, Rochester, New York, 14624.

47.     Defendant DiChario is a citizen of the State of New York.

48.     Defendant Joseph Calabro (Calabro) is the Director of Marketing and Purchasing for American Tactical. Upon information and belief, he oversees and directs American Tactical marketing, including on its social media platforms. Calabro is also Director of Marketing and Purchasing at AmChar.

49.     Defendant Calabro is a citizen of the State of New York.

50.     Defendant Schmeisser GmbH (Schmeisser) is a German corporation that manufactures firearm accessories, weapon system components, and firearms, including AR-15 style rifles, and has a principal place of business in Krefeld, Germany. Schmeisser uses Defendant American Tactical as its sole importer and distributor for the United States market.

51.     Defendant 365 Plus d.o.o. (365 Plus), is a Slovenian corporation that designs, manufactures, and distributes firearms accessories, and has its principal place of business in Ljubljana, Slovenia. Upon information and belief, Defendant 365 Plus acted as a global distributor for Schmeisser firearm accessories, including its 60-round rifle magazines.

52.     Defendant Schmeisser manufactured the Magazine and distributed it into the United States through Defendants American Tactical and 365 Plus.

### JURISDICTION AND VENUE

53.     This Court has jurisdiction over this matter under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

54.     This Court has personal jurisdiction over Defendant American Tactical because Defendant American Tactical has sufficient minimum contacts with Indiana, or otherwise intentionally avails itself of Indiana markets through sale and distribution of its products.

55.     Venue is proper in this District under 28 U.S.C. § 1331(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

56.     This Court has personal jurisdiction over Defendant DiChario as President of Defendant American Tactical because American Tactical is an agent of DiChario. American Tactical does business in this District and caused personal injury or property damage by its acts

within this District.

57.     This Court has personal jurisdiction over Defendant Calabro as Director of Marketing and Purchasing for American Tactical because American Tactical is an agent of Calabro. American Tactical does business in this District and caused personal injury or property damage by an act within this District.

58.     This Court has personal jurisdiction over Defendant Schmeisser as Defendant Schmeisser has sufficient minimum contacts with Indiana, or otherwise intentionally avails itself of Indiana markets through sale and distribution of its products to Defendant American Tactical.

59.     This Court has personal jurisdiction over Defendant 365 Plus as Defendant 365 Plus has sufficient minimum contacts with Indiana, or otherwise intentionally avails itself of Indiana markets through sale and distribution of its products.

60.     Thus, venue and jurisdiction are proper in this Court.

## GENERAL ALLEGATIONS

**A.     DEFENDANTS' HCMS ARE UNREASONABLY DANGEROUS FIREARMS ACCESSORIES THAT ENABLE UNLAWFUL MASS SHOOTINGS LIKE THE ATTACK WHEN SOLD TO CIVILIANS**

61.     Defendants market, import, manufacture, distribute, and sell HCMs like the Magazine as firearms accessories for members of the civilian public to add as accessories to guns so that they can fire 60 rounds without reloading.

62.     A 60-round HCM like the Magazine is not a component part of a firearm.

63.     Upon information and belief, the Magazine was not sold or packaged with a firearm.

64.     Upon information and belief, Defendants' 60-round HCMs are rarely sold or packaged with any firearm.

65.     A 60-round HCM is not essential to the discharge of a gun.

66.     Indeed, a gun like the Firearm can and will fire with a smaller magazine or with no magazine attached but a round in the chamber.

67.     The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) labels HCMs as "firearm accessories."

68.     HCM accessories are useful when combined with guns—especially military-style assault firearms like AR-15-style guns—to inflict a high number of casual- ties in a short period without the need to constantly reload the weapon.

69.     For the civilian market, the only people who need HCMs are mass  killers.

70.     Defendants have long known that mass killers are attracted to buy HCMs, and that this group uses HCMs to commit horrific, mass slaughters.

71.     These incidents include, but are not limited to:

a.     On August 4, 2019, a shooter armed with an AR-15 style rifle and a 100-round magazine attacked a crowd in an entertainment district of Dayton, Ohio, where he killed nine people, while wounding 17 others.

b.     On July 28, 2019, a shooter armed with an AK-47-style rifle, a 75- round drum magazine and multiple 40-round magazines attacked a  festival in  Gilroy, California, where he killed 3 people, while wounding 13 more.

c.     On November 7, 2018, a shooter armed with a pistol and multiple 30-round magazines attacked a bar and grill in Thousand Oaks, California, where he killed 11 people.

d.     On February 14, 2018, a shooter armed with an AR-15-style rifle and several 30- or 40-round magazines attacked the Marjory Stoneman Douglas High School in Parkland, Florida, where he killed 17 people, while wounding 17 more.

e.     On November 5, 2017, a shooter armed with an AR-15-style rifle and around 15 30-round magazines attacked a church in Sutherland Springs, Texas, where he killed 26 people, while wounding 20 more.

f.     On October 1, 2017, a shooter armed with multiple firearms – including several AR-15-style rifles – twelve 100-round magazines and a 40-round magazine attacked a music festival in Las Vegas, Nevada, where he killed 58 people, while wounding hundreds.

g.     On June 12, 2016, a shooter armed with multiple firearms – including an assault-style rifle – and multiple 30-round magazines attacked a nightclub in Orlando, Florida, where he killed 49 people, while wounding 53 more.

h.     On December 2, 2015, two shooters armed with multiple AR-15- style rifles and four 30-round magazines attacked a regional center in San Bernadino,

California, where he killed 14 while injuring 21.

    **i.**    On June 7, 2013, a shooter armed with multiple firearms -- including an AR-15-style rifle – and 40 30-round magazines at- tacked a college in Santa Monica, where he killed 5 people.

    **j.**    On December 14, 2012, a shooter armed with multiple firearms – including an AR-15-style rifle – and one or more 30-round magazines attacked an elementary school in Newtown, Connecticut, where he killed 27 people (including 20 children).

    **k.**    On July 20, 2012, a shooter armed with multiple firearms – including an AR-15-style rifle – and at least one 100-round and one 40-round magazine attacked a movie theater in Aurora, Colorado, where he killed 12 people, while wounding 58 more.

72.    In addition to these specific, illustrative examples, a publicly available analysis released by Everytown for Gun Safety on March 22, 2019, surveyed mass shootings from 2009-2017 and found that 58% of mass shootings with known magazine capacity data involved firearms with HCMs.

73.    Mass shooters disproportionately use HCMs like the Magazine in part because the large volume of rounds minimizes the number of times a shooter must pause and reload.

74.    The scarcity of reloading intervals decreases opportunities for victims to escape or fight back and makes it harder for law enforcement to intervene to stop the shooter.

75.    This helps explain why mass shootings involving HCMs, on average, result in over two times as many deaths and over 14 times as many injuries as mass shootings that do not involve HCMs.

76.    Upon information and belief, because many mass shooters delusionally seek fame or glory by maximizing their number of victims, a lack of access to HCMs, which often enable a high casualty count, would cause many potential mass shooters to delay or cancel planned attacks.

77.    This would, in turn, provide crucial opportunities for law enforcement or others to intervene before these individuals commit any violent crimes.

78.    While HCMs are useful to effectively engage in mass slaughters, they are unnecessary for lawful self-defense or hunting, and are, in practice, very rarely used for legal self-defense.

79.     This reality was recently illustrated by the evidence presented in two separate challenges to state HCM restrictions preceding the Attack.

80.     Specifically, in *Colorado Outfitters Ass'n,* the District Court of Colorado, in rejecting a Second Amendment challenge to Colorado's HCM ban, found that:

> No evidence presented here suggests that the generalability of a person to defend him or herself is seriously diminished if magazines are limited to 15 rounds. Despite more than 40 years instructing individuals and law enforcement in defensive firearm use, the Plaintiffs' expert witness . . . identified only three anecdotal instances in which individuals engaging in defensive use of firearms fired more than 15 rounds.

*Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1069 (D. Colo. 2014), vacated and remanded, 823 F.3d 537 (10th Cir. 2016).

81.     The court further underscored that "of the many law enforcement officials called to testify, none were able to identify a single instance in which they were involved where a single civilian fired more than 15 shots in self-defense." *Id*. at 1069- 1070.

82.     An expert report in that litigation noted that analyses of two sets of hundreds of self-defense uses of firearms had both found the average number of shots fired in self-defense to be just over two. *Id.*, Exp't Rep. of Jeffrey Zax, Ph.D. at 5-6.

83.     Similarly, in *Duncan v. Becerra,* 366 F. Supp. 3d 1131 (S.D. Cal. 2019), an expert review of 736 incidents of self-defense revealed that a defender had fired over 10 rounds only twice, and that the average number of shots fired was just over two.

84.     There have been no incidents of which Plaintiffs are aware in which a 60-round HCM was needed—or even used—by a law-abiding person for lawful self- defense or protection.

85.     In nearly all realistic scenarios, a 60-round HCM is unnecessary for the lawful use of a firearm in self-defense.

86.      Gun rights advocate David Kopel, in testimony before the Senate Judiciary Committee, agreed with this conclusion (as it regards slightly larger magazines) when he testified that "[h]undred round magazines are novelty items, and are not standard for self-defense by civilians or police."

87.     A 60-round HCM is also not only unnecessary but even counter-productive for hunting game.

88.     This is because firing scores of rounds at an animal target will effectively disintegrate the animal and make eating or mounting the animal carcass all but im- possible.

89.     Jim Webber, a Michigan gun owner, hunter, and sportsman, made the lack of application of HCMs in the hunting context clear in an op-ed where he called HCMs "weapons of mass destruction" and advised that Michigan's "magazine limits do not detract from either the hunting or recreational shooting experience and most likely enhance the sportsmanship and safety of both."

90.     A 60-round HCM like the Magazine, when sold to civilians, has but one meaningful application in the civilian world: to facilitate unlawful, offensive military- style combat missions by allowing individuals like the Shooter to kill or maim large numbers of people in a short time.

91.     There is overwhelming consensus supported by clear data that a 60- round HCM like the Magazine is unreasonably dangerous to distribute, market, or sell to the general civilian public.

### B.     DEFENDANTS ASSUMED A DUTY TO EXERCISE THE HIGHEST DEGREE OF REASONABLE CARE IN REGARD TO FIREARMS ACCESSORIES.

92.     Defendants, when they chose to enter the business of marketing, manufacturing, distributing, or selling lethal firearms accessories, voluntarily assumed a duty to take every reasonable step to minimize the likelihood that products like the Magazine would be misused in an unlawful act of violence like the Attack.

93.     This duty is multifaceted.

94.     One key aspect of this duty was an obligation to never place a firearm accessory on the market whose benefits to lawful firearms owners were non-existent or, at best, negligible in comparison to the threat the accessory posed to public safety.

95.     However, because the Defendants decided to sell or distribute HCMs to the public anyway, they were obligated to implement protocols or safeguards to minimize to the greatest extent possible individuals like the Shooter from acquiring inherently dangerous products like the Magazine.

96.     Another aspect of that duty is to follow all applicable laws, including not causing a public nuisance in violation of Indiana common law and Indiana Code § 32-30-6-6.

97.     The duty also includes a requirement to market and advertise their products responsibly and not falsely or deceptively in violation of New York's Unfair Trade Practices Act

("NYUTPA") N.Y. Gen. Bus. Law § 349-350 and Indiana's Deceptive Consumer Sales Act Ind. Code § 24-5-0.5 *et seq*.

98.    The duty to implement reasonable safeguards—both for their own direct sales from their website and for downstream retail sellers of Schmeisser, American Tactical, or 365 Plus products--include, but are not limited to:

    **a.**    requiring all transfers of HCMs to be conducted face-to-face in person by an FFL;

    **b.**    conducting criminal history, substance abuse, and mental health background checks or screenings on all prospective purchasers of HCMs;

    **c.**    requiring all prospective purchasers of HCMs to certify that they are not disqualified from owning firearms under any provision of state or federal law;

    **d.**    requiring all prospective purchasers of HCMs to certify that they are the actual end user of the firearm accessory (rather than buying the firearm accessory on behalf of another);

    **e.**    requiring any prospective customer of an HCM to provide a legitimate, verifiable reason for needing an HCM and only transferring HCMs when they have reasonable grounds to believe the prospective purchaser actually has a legitimate, verifiable intended use for the HCMs;

    **f.**    continually monitoring information from law enforcement, the media and other sources about the misuse of Schmeisser, American Tactical, or 365 Plus products like the Magazine in acts of gun violence, and adjusting business practices whenever such information indicates that aspects of their existing business practices might have enabled a dangerous product to fall into the hands of a criminal actor;

    **g.**    only providing HCMs to retail sellers or downstream distributors who commit to each of the safeguards described above;

    **h.**    exercising oversight to verify that all retail sellers and downstream distributors of Schmeisser, American Tactical, and 365 Plus products like the Magazine are, in fact, complying with safeguards like those listed above and terminating business relationships or otherwise disciplining downstream actors who are not in compliance with these safeguards; and

      **i.**    avoiding marketing practices reasonably likely to appeal to dangerous classes of people like the Shooter.

99.    Upon information and belief, Defendants failed to implement any such safeguards or screening.

100.    Additionally, as shown below, Defendants have made the decision to market their HCMs in whichever ways will result in the most sales, even if its marketing attracts a dangerous category of individual.

### C.    DEFENDANTS MARKETED AND DESIGNED THE MAGAZINE IN A WAY THAT FORESEEABLY ATTRACTED AND ENABLED DANGEROUS INDIVIDUALS LIKE THE SHOOTER.

101.    Defendants breached their duty to use reasonable care in marketing, advertising, and promoting their HCMs.

#### a.    DEFENDANTS' MARKETING ATTRACTED A DANGEROUS CATEGORY OF CONSUMER.

102.    When Defendants marketed the Magazine, they knew or should have known of the existence of a category of consumers containing individuals like the Shooter, who would be attracted to such a weapon accessory and could pose a tremendous risk to the safety of others—namely impulsive young men with insecurities regarding their masculinity (*i.e.*, the need to harm others in order to prove their strength), militaristic delusions, and suicidal ideations attracted to using the particularly high lethality of HCMs like the Magazine to effectively execute their fantasies.

103.    Decades of scientific evidence demonstrate that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood. As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky, destructive, impulsive, and sociopathic behavior. Moreover, emotions such as anger, depression, alienation, and anxiety—which are more strongly felt by adolescents—can dilute the already weak control adolescents and post-adolescents exercise over their impulses and urges.

104.    Scientifically based studies have further shown that this susceptibility to and predilection for risky, thrill-seeking behavior extends to violent criminal behavior. Indeed, a disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, and 18- to 20-year-olds commit gun homicide at a rate nearly four times higher

14

than adults 21 and older.

105.    Adolescents and young adults also exhibit increased susceptibility to advertisements, and research indicates that they are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior. For instance, companies promoting products such as tobacco and alcohol have exploited the vulnerability of young consumers to advertisements that promote thrill-seeking conduct in order to draw them in early and convert them into lifelong purchasers of their products.

106.    Research further suggests that one propensity can feed the other: young people may be particularly responsive to advertisements portraying impulsive or risky behavior when they are in a negative emotional state involving, for instance, depression, alienation, or anger. As studies have shown, such young people are more vulnerable to acting on impulse to seek immediate gratification.

107.    For individuals with risk factors for violence, particularly emotionally troubled young men, the physical presence of assault weapons, HCMs, and related imagery make violent actions more likely. The medical literature describes a "weapons effect," wherein the physical presence of a firearm may incite aggressive cognition and provoke violent behavior. Violence has infectious qualities: individuals may emulate previous killers or violent acts they have observed, a concept known as "identification." Assault weapons advertisements also activate people who are predisposed to violence but might not engage in it if they did not have access to the weapons or accessories.

108.    Despite this troubling information, Defendants target their advertising and marketing to exactly this vulnerable group: emotionally troubled young men. Defendants do so even though, as participants in a highly profitable, but uniquely dangerous market, they can reasonably be expected to be fully aware of these facts.

       **b.    DEFENDANTS' USE OF VIDEO GAME AND ACTION MOVIE AESTHETIC.**

109.    Defendants, instead of acting carefully when marketing and selling their highly lethal HCMs to civilians to minimize the likelihood that they did not fall into dangerous hands, published video advertisements on social media platforms of their HMCs featuring extreme violence and reckless spraying of bullets.

110.    The marketing videos were produced by firearms media production company Polenar Tactical.

111.    Defendant American Tactical posted two marketing videos for the Schmeisser HMCs

15

to its YouTube page.

112.    Defendant American Tactical posted one of the video advertisements, titled "Polenar Tactical x Schmeisser Germany x ATI presents the AKS60," on March 30, 2021—two weeks before the Attack on April 15. The tag line for the advertisement is: "Schmeisser and ATI, in partnership with Polenar Tactical, are happy to present the first action footage of the Schmeisser AK S60 magazine. … Enjoy!" It is an advertisement for the Schmeisser 60-round magazine for AK-47 assault rifles.



113.    It depicts various men dressed in tactical vests like the Shooter wore during the Attack firing a constant stream of bullets at unseen targets in various offensive, tactical operations, as depicted in the screenshots below.







114.    Another video advertises the specific model of Magazine bought and used by the Shooter in the Attack, the Schmeisser Gen II 60-round magazine. It is titled "Introducing the Gen II Schmeisser 60rd magazine." The tag line for the video advertisement is: "American Tactical, Inc. is the exclusive distributor for the Schmiesser 60 rd magazine. Thank you to the entire team

at Polenar Tactical for producing this great video of the magazine in action!"



115.    The current American Tactical YouTube URL for this video advertise- ment displays: "This video has been removed for violating YouTube's Community Guidelines." youtube.com/watch?v=FBZHVyS_77E, but is still published elsewhere on YouTube with a link to American Tactical's website.

116.    That video advertisement, in the style of a trailer for a violent video game or action movie, is set over an audio track that begins with tense, ominous tones before dropping to inspirational and nationalistic music and a continuous barrage of gunfire beginning with the first click of the Schmeisser Gen II 60-round magazine into the characters' assault rifles. Thus, begins imagery of two men, dressed in the same tactical vests that the Shooter wore during the Attack, engaging in an offensive, tactical shooting operation. The video shows a reckless, continual spray of bullets, some slow-motion action shots, and the characters moving in to attack and shoot un- seen targets. The staccato of gunfire—displaying the ability to use the Schmeisser HCMs for continuous, rapid gunfire without a need to reload—and the raining of shells toward the end of the video reaches a crescendo while the shooter sprays bullets into a dark void and turns to the viewer to grin. Various screenshots of this video depict these sequences.







117.    Defendant American Tactical published these video advertisements and established a marketing presence on social media platforms like YouTube that are disproportionately visited by adolescent consumers.

118.    Defendant 365 Plus also published the above video advertisement to its YouTube page, at youtube.com/watch?v=RGuL0qoVJLo, with the  following leaderboard added to the video advertisement:

21



   **c.** **THE SHOOTER FELL WITHIN THE DANGEROUS CATEGORY OF CON- SUMERS AND WAS FORESEEABLY MOTIVATED BY DEFENDANTS' MARKETING AND DESIGN.**

  119. The Shooter fell within the dangerous category of consumers targeted by Defendants' extreme and deceptive marketing tactics.

  120. The Shooter, depicted in the photograph below, was 19 years old.



121.    The Shooter obsessively played video games and also consumed social media, including YouTube.

122.    The Shooter had been in treatment for severe and readily noticeable and observable mental health problems.

123.    At a press conference after the Attack, local and federal officials said the Attack was "an act of suicidal murder" in which the Shooter decided to kill himself "in a way he believed would demonstrate his masculinity and capability while fulfilling a final desire to experience killing people."

124.    A federal agent also said the Shooter aspired to join the military. Authorities added that he had been eating MREs, or meals ready-to-eat, like those consumed by members of the armed forces.

125.    Notably, during the Attack, the Shooter wore a tactical vest nearly identical to the gear used in Defendants' video advertisement by individuals engaged in an offensive, tactical, combat-like operation.

126.    Upon information and belief, the Shooter watched Defendants' video advertisements.

127.    Upon information and belief, the Shooter was thus foreseeably motivated by

Defendants' marketing and design to purchase the Magazine and use it to carry out the Attack.

### D. DEFENDANTS HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE, SINCE BEFORE 2021, THAT VIOLATING THEIR DUTY OF CARE WOULD LIKELY RESULT IN A MASS SHOOTING LIKE THE ATTACK.

128.    Upon information and belief, all of the Defendants had actual or constructive knowledge that violations of their duty of care by marketing, manufacturing, distributing, or selling products like the Magazine without reasonable safeguards and in violation of Indiana and New York public nuisance laws, NYUTPA, and Indiana's Deceptive Consumer Sales Act would likely result in one or more of their products being used in one or more mass shootings like the Attack.

129.    The basis for this actual or constructive notice includes, but is not limited to, a lengthy string of widely publicized mass shooting incidents throughout the United States in which shooters used HCMs to engage in mass slaughter.

130.    Further, upon information and belief, Defendants are aware that many states have banned HCMs because of the unreasonable dangers they pose. For the same reason, law enforcement has long called for sales of HCMs to be banned for civilians, and those demands helped lead to a federal ban on HCM sales from 1994 - 2004.

### E. DEFENDANTS VIOLATED THEIR DUTY OF CARE IN WAYS THAT DIRECTLY AND FORESEEABLY CHANNELED THE MAGAZINE TO THE SHOOTER AND CAUSED PLAINTIFFS' HARM.

131.    Despite their actual or constructive knowledge that violation of one or more aspects of their duties of care would create a significant risk that a highly dangerous product like the Magazine would be used to perpetrate a mass shooting like the Attack, Defendants violated one or more aspects of their duty of care in ways that directly and foreseeably led to the Attack.

132.    First, Defendants unreasonably manufactured, distributed, or sold 60- round HCMs with full awareness that 60-round HCMs have no or negligible utility for lawful uses of firearms, but pose a tremendous risk to public safety because they are extremely effective and desirable for use in mass shootings.

133.    Had Defendants not violated their duty of reasonable care by placing an unreasonably dangerous product on the market, the Shooter would never have gained access to the Magazine.

134.    Second, upon information and belief, none of the Defendants implemented any

reasonable safeguards or protocols to screen out potentially dangerous purchasers (such as those described in this Complaint).

135.   Upon information and belief, Defendants know that criminals, including mass killers, are attracted to the Internet because of its anonymity and lack of regulation.

136.   Defendants nonetheless sell HCMs online, without any safeguards, screening, or reasonable conditions.

137.   Anyone, regardless of age, criminal history, or mental health history, can buy an HCM like the Magazine used in the Attack directly off of Defendant American Tactical's website. Defendant American Tactical makes no further inquiry about the buyer or the purpose for buying an HCM before selling it through its website and includes no screening whatsoever prior to purchase.

138.   Similarly, Defendant American Tactical sells its HCMs like the Magazine used in the Attack through other online firearms websites, also without any limitations, screening, or further inquiry.

139.   Had the Defendants complied with their duty of care by implementing some limitations on their own retail sales or by supervising their chains of distribution so as to require the retail sale of their products to be governed by such reasonable procedures, the Shooter would, upon information and belief, not have had access to the Magazine because such safeguards would have blocked him from acquiring the Magazine.

140.   Specifically, *inter alia*, had the Defendants required all transfers of HCMs to be face to face in person, required mental health screenings, or requiredall purchasers to provide a legitimate, verifiable, and credible reason for needing and HCM, the Shooter would not have legally acquired the Magazine.

141.   Defendants additionally breached their duty of care by aggressively marketing their HCMs in a manner designed to disproportionately appeal to and influence dangerous people like the Shooter.

142.   Finally, had the Defendants similarly complied with applicable state and federal laws, including, but not limited to New York's and Indiana's prohibitions on the creation of public nuisances by acting responsibly in controlling their chains of distribution and New York's Unfair Trade Practices Act and Indiana's Deceptive Consumer Sales Act prohibiting false and deceptive marketing, the Shooter also would not have legally gained access to the Magazine.

143.     It was eminently foreseeable that Defendants' violations of their applicable duty of care would lead to an incident like the Attack by arming one or more dangerous individuals like the Shooter with a lethal tool especially well-suited to misuse in mass shootings.

144.     This was because of, among other things, a lengthy history of mass shootings involving HCMs – often smaller HCMs than a monstrous 60-round magazine—leading up to 2021.

145.     This foreseeable harm is precisely what materialized.

146.     April 15, 2021, shortly after 11:00 p.m., the FedEx facility was filled with people. It was payday and many employees were picking up their paychecks. It was also shift change time and employees were, therefore, both arriving and departing the facility. The Shooter entered the FedEx facility, cloaked in a tactical vest and wielding two AR-style rifles with HCMs attached. After shooting and killing two employees in the locker room, the Shooter opened fire on a group of employees who were waiting to pick up their paychecks.

147.     As a result of the massive capacity of the Magazine and the corresponding lack of a need to pause and reload, the Shooter was able to discharge 60 rounds in a matter of seconds.

148.     This uninterrupted torrent of fire enabled by the Magazine did not provide the Shooter's victims with any meaningful chance to escape or fight back.

149.     The Defendants' unlawful and reckless conduct in manufacturing, distributing, marketing, or selling the unreasonably dangerous Magazine directly and foreseeably led to 13 people being shot with bullets expended from the Magazine during the Attack (including 8 who suffered fatal wounds).

150.     Plaintiffs are, thus, entitled to civil justice against the Defendants in terms of redress for the damages directly and proximately flowing from the Defendants' negligent business practices in manufacturing, distributing, marketing, or selling the Magazine.

151.     Upon information and belief, the Defendants have also not changed their negligent practices in any manner since the Attack, other than being forced to take down one of its advertising videos because it violated YouTube Community Guidelines. The other video advertisement remains on Defendant American Tactical's YouTube page.

152.     As a result, Plaintiffs are entitled to injunctive relief to abate the ongoing nuisance created by Defendants' misconduct with regard to 60-round HCMs.

26

## **FIRST CAUSE OF ACTION**
### **(Negligence—All Defendants)**
### **Gurinder Johal, as personal representative of the Estate of Amarjeet Johal**

153.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

154.    Plaintiff Gurinder Johal brings this claim as Personal Representative of the Estate of Amarjeet Johal, deceased.

155.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

156.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

157.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

158.    Instead, upon information and belief, Defendants' negligent conduct channeled the Magazine into the hands of the Shooter.

159.    It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis- used in incidents like the Attack.

160.    This is precisely what occurred in this case.

161.    Defendants' negligence is an actual and proximate or legal cause of Amarjeet Johal's death.

162.    As a result of Defendants' negligence, Amarjeet Johal suffered fatal injuries, and her Estate incurred medical bills, funeral and burial expenses, the costs of administering the Estate, and her surviving family members suffered the loss of love, care, and affection of Amarjeet Johal. Gurinder Johal, as Personal Representative of the Estate of Amarjeet Johal, now seeks to recover these damages in an amount in excess of $75,000.

163.    Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Amarjeet Johal.

164.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

165.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

166.    As Personal Representative of Amarjeet Johal's Estate, Gurinder Johal seeks punitive damages pursuant in an amount appropriate to punish Defendants and to deter similar conduct in the future.

167.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

### SECOND CAUSE OF ACTION
### (Wrongful Death—All Defendants)
### Gurinder Johal, as personal representative of the Estate of Amarjeet Johal

168.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

169.    Plaintiff Gurinder Johal, as the Personal Representative of Amarjeet Johal's Estate brings this cause of action and alleges that Defendants' negligence is a legal and/or proximate cause of Amarjeet Johal's death.

170.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

171.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

172.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

173.    Instead, upon information and belief, Defendants' negligent conduct directly

28

channeled the Magazine into the hands of the Shooter.

174.    It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis- used in incidents like the Attack.

175.    This is precisely what occurred in this case.

176.    Thus, Defendants' negligent and unlawful conduct directly  and proximately caused Plaintiff's harm.

177.    Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of Amarjeet Johal's injuries and death.

178.    As a result of Defendants' negligence, Amarjeet Johal suffered fatal injuries, and her Estate incurred medical bills, funeral and burial expenses, the costs of administering the Estate, and her surviving family members suffered the loss of love, care, and affection of Amarjeet Johal. Gurinder Johal, as Personal Representative of the Estate of Amarjeet Johal, now seeks to recover these damages in an amount in excess of $75,000.

179.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Amarjeet Johal.

180.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

181.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

182.    As Personal Representative of Amarjeet Johal's Estate, Gurinder Johal seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

183.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

## THIRD CAUSE OF ACTION
### (Public Nuisance—All Defendants)
### Gurinder Johal, as personal representative of the Estate of Amarjeet Johal

184.   Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

185.   Plaintiff Gurinder Johal brings this claim as Personal Representative of the Estate of Amarjeet Johal.

186.   All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

187.   A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

188.   A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

189.   All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

190.   As a result of the Attack, Amarjeet Johal suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

191.   Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

192.   Defendants' nuisance, negligence, and wrongful acts was the actual and proximate or legal cause of Amarjeet Johal's injuries and death.

193.   As a result of Defendants' nuisance, negligence, and wrongful acts, Amarjeet Johal suffered fatal injuries, and her Estate incurred medical bills, funeral and burial expenses, the costs of administering the Estate, and her surviving family members suffered the loss of love, care, and affection of Amarjeet Johal. Gurinder Johal, as Personal Representative of the Estate of Amarjeet Johal, now seeks to recover these damages in an amount in excess of $75,000.

194.   Defendants conduct was carried out with reckless, willful, and conscious disregard

for the safety of the public, including Amarjeet Johal.

195.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

196.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

197.    As Personal Representative of Amarjeet Johal's Estate, Gurinder Johal seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

198.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

199.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

200.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

### FOURTH CAUSE OF ACTION
**(Wrongful Death in re: Public Nuisance—All Defendants)**
**Gurinder Johal, as personal representative of the Estate of Amarjeet Johal**

201.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

202.    Plaintiff Gurinder Johal is the Personal Representative of the Estate of Amarjeet Johal, deceased.

203.    Plaintiff Gurinder Johal brings this claim as Personal Representative of the Estate of Amarjeet Johal.

204.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

205.    A public nuisance under Indiana and New York law exists for conduct that amounts

to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

206.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

207.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

208.    As a result of the Attack, Amarjeet Johal suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

209.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

210.    Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of Amarjeet Johal's injuries and death.

211.    As a result of Defendants' negligence, Amarjeet Johal suffered fatal injuries, and her Estate incurred medical bills, funeral and burial expenses, the costs of administering the Estate, and her surviving family members suffered the loss of love, care, and affection of Amarjeet Johal. Gurinder Johal, as Personal Representative of the Estate of Amarjeet Johal, now seeks to recover these damages in an amount in excess of $75,000.

212.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Amarjeet Johal.

213.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

214.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

215.    As Personal Representative of Amarjeet Johal's Estate, Gurinder Johal seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

216.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

217.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

218.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

### FIFTH CAUSE OF ACTION
**(Negligence—All Defendants)**
**Diljot Sekhon, as personal representative of the Estate of Amarjit Sekhon**

219.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

220.    Plaintiff Diljot Sekhon brings this claim as Personal Representative of the Estate of Amarjit Sekhon, deceased.

221.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

222.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

223.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

224.    Instead, upon information and belief, Defendants' negligent conduct channeled the Magazine into the hands of the Shooter.

225.    It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis- used in incidents like the Attack.

226.    This is precisely what occurred in this case.

227.    Defendants' negligence is an actual and proximate or legal cause of Amarjit

Sekhon's injuries and death.

228.     As a result of Defendants' negligence, Amarjit Sekhon suffered fatal injuries which proximally caused her death, her Estate incurred medical bills, funeral and burial expenses, her husband and sons have suffered a loss of earnings of Amarjit, a loss of support, services, society, care, love and affection and acts of kindness of Amarjit as provided by Ind. Code 34-23-1-1. Diljot Sekhon, as Personal Representative of the Estate of Amarjit Sekhon, now seeks to recover these damages in an amount in excess of $75,000.

229.     Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Amarjit Sekhon.

230.     Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

231.     Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

232.     As Personal Representative of Amarjit Sekhon's Estate, Diljot Sekhon seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

233.     The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

### SIXTH CAUSE OF ACTION
**(Wrongful Death—All Defendants)**
**Diljot Sekhon, as personal representative of the Estate of Amarjit Sekhon**

234.     Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

235.     Plaintiff Diljot Sekhon, as the Personal Representative of Amarjit Sekhon's Estate brings this cause of action and alleges that Defendants' negligence is a legal and/or proximate cause of Amarjit Sekhon's death.

236.     All Defendants voluntarily assumed a multifaceted duty of care to only

manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

237.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

238.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

239.    Instead, upon information and belief, Defendants' negligent conduct directly channeled the Magazine into the hands of the Shooter.

240.    It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis- used in incidents like the Attack.

241.    This is precisely what occurred in this case.

242.    Thus, Defendants' negligent and unlawful conduct directly  and proximately caused Plaintiff's harm.

243.    Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of Amarjit Sekhon's injuries and death.

244.    As a result of Defendants' negligence, Amarjit Sekhon suffered fatal injuries which proximally caused her death, her Estate incurred medical bills, funeral and burial expenses, her husband and sons have suffered a loss of earnings of Amarjit, a loss of support, services, society, care, love and affection and acts of kindness of Amarjit as provided by Ind. Code 34-23-1-1. Diljot Sekhon, as Personal Representative of the Estate of Amarjit Sekhon, now seeks to recover these damages in an amount in excess of $75,000.

245.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Amarjit Sekhon.

246.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

247.     Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

248.     As Personal Representative of Amarjit Sekhon's Estate, Diljot Sekhon seeks punitive damages pursuant to in an amount appropriate to punish Defendants and to deter similar conduct in the future.

249.     The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

### SEVENTH CAUSE OF ACTION
**(Public Nuisance—All Defendants)**
**Diljot Sekhon, as personal representative of the Estate of Amarjit Sekhon**

250.     Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

251.     Plaintiff Diljot Sekhon brings this claim as Personal Representative of the Estate of Amarjit Sekhon.

252.     All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

253.     A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

254.     A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

255.     All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

256.     As a result of the Attack, Amarjit Sekhon suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

257.     Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

36

258.    Defendants' nuisance, negligence, and wrongful acts was the actual and proximate or legal cause of Amarjeet Johal's injuries and death.

259.    As a further actual and proximate legal result of Defendants' nuisance, negligence, and wrongful acts, Amarjit Sekhon suffered fatal injuries which proximally caused her death, her Estate incurred medical bills, funeral and burial expenses, her husband and sons have suffered a loss of earnings of Amarjit, a loss of support, services, society, care, love and affection and acts of kindness of Amarjit as provided by Ind. Code 34-23-1-1. Diljot Sekhon, as Personal Representative of the Estate of Amarjit Sekhon, now seeks to recover these damages in an amount in excess of $75,000.

260.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Amarjit Sekhon.

261.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

262.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

263.    As Personal Representative of Amarjit Sekhon's Estate, Diljot Sekhon seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

264.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

265.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

266.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

**EIGHTH CAUSE OF ACTION**
**(Wrongful Death in re: Public Nuisance—All Defendants)**
**Diljot Sekhon, as personal representative of the Estate of Amarjit Sekhon**

267.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if

restated fully herein.

268.    Plaintiff Diljot Sekhon brings this claim as Personal Representative of the Estate of Amarjit Sekhon.

269.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

270.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

271.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

272.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality  of mass shootings like the Attack.

273.    As a result of the Attack, Amarjit Sekhon suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

274.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

275.    Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of Amarjit Sekhon's injuries and death.

276.    As a further actual and proximate legal result of Defendants' nuisance, negligence, and wrongful acts, Amarjit Sekhon suffered fatal injuries which proximally caused her death, her Estate incurred medical bills, funeral and burial expenses, her husband and sons have suffered a loss of earnings of Amarjit, a loss of support, services, society, care, love and affection and acts of kindness of Amarjit as provided by Ind. Code 34-23-1-1. Diljot Sekhon, as Personal Representative of the Estate of Amarjit Sekhon, now seeks to recover these damages in an amount in excess of $75,000.

277.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Amarjit Sekhon.

278.    Defendants' conduct including, but not limited to, its failure to implement

safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

279.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

280.    As Personal Representative of Amarjit Sekhon's Estate, Diljot Sekhon seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

281.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

282.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

283.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

### NINTH CAUSE OF ACTION
**(Negligence—All Defendants)**
**Jaspreet Sekhon, as personal representative of the Estate of Jasvinder Kaur**

284.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

285.    Plaintiff Jaspreet Sekhon brings this claim as Personal Representative of the Estate of Jasvinder Kaur, deceased.

286.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

287.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

288.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

289.    Instead, upon information and belief, Defendants' negligent conduct channeled the

Magazine into the hands of the Shooter.

290.   It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis used in incidents like the Attack.

291.   This is precisely what occurred in this case.

292.   Defendants' negligence is an actual and proximate or legal cause of Jasvinder Kaur's injuries.

293.   As result of Defendants' negligence, Jasvinder Kaur suffered fatal injuries, and her Estate incurred medical bills, funeral and burial expenses, the costs of administering the Estate, and her surviving family members suffered the loss of love, care, and affection of Jasvinder Kaur. Jaspreet Sekhon, as Personal Representative of the Estate of Jasvinder Kaur, now seeks to recover these damages in an amount in excess of $75,000.

294.   Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Jasvinder Kaur.

295.   Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

296.   Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

297.   As Personal Representative of Jasvinder Kaur's Estate, Jaspreet Sekhon seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

298.   The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

**<ins>TENTH CAUSE OF ACTION</ins>**
**(Wrongful Death—All Defendants)**
**Jaspreet Sekhon, as personal representative of the Estate of Jasvinder Kaur**

299.     Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

300.     Plaintiff Jaspreet Sekhon, as the Personal Representative of Jasvinder Kaur's Estate brings this cause of action and alleges that Defendants' negligence is a legal and/or proximate cause of Jasvinder Kaur's death.

301.     All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

302.     All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

303.     Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

304.     Instead, upon information and belief, Defendants' negligent conduct directly channeled the Magazine into the hands of the Shooter.

305.     It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis- used in incidents like the Attack.

306.     This is precisely what occurred in this case.

307.     Thus, Defendants' negligent and unlawful conduct directly  and proximately caused Plaintiff's harm.

308.     Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of Jasvinder Kaur's injuries and death.

309.     As result of Defendants' negligence, Jasvinder Kaur suffered fatal injuries, and her Estate incurred medical bills, funeral and burial expenses, the costs of administering the Estate, and her surviving family members suffered the loss of love, care, and affection of Jasvinder Kaur. Jaspreet Sekhon, as Personal Representative of the Estate of Jasvinder Kaur, now seeks to recover these damages in an amount in excess of $75,000.

310.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Jasvinder Kaur.

311.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

312.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

313.    As Personal Representative of Jasvinder Kaur's Estate, Jaspreet Sekhon seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

314.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

## ELEVENTH CAUSE OF ACTION
### (Public Nuisance—All Defendants)
### Jaspreet Sekhon, as personal representative of the Estate of Jasvinder Kaur

315.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

316.    Plaintiff Jaspreet Sekhon brings this claim as Personal Representative of the Estate of Jasvinder Kaur, deceased.

317.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

318.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

319.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

320.    All Defendants, by failing to act in accordance with their applicable duty of care,

substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

321.    As a result of the Attack, Jasvinder Kaur suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

322.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

323.    Defendants' nuisance, negligence, and/or wrongful acts was the actual and proximate or legal cause of Jasvinder Kaur's injuries and death.

324.    As a result of Defendants' nuisance, negligence, Jasvinder Kaur suffered fatal injuries, and her Estate incurred medical bills, funeral and burial expenses, the costs of administering the Estate, and her surviving family members suffered the loss of love, care, and affection of Jasvinder Kaur. Jaspreet Sekhon, as Personal Representative of the Estate of Jasvinder Kaur, now seeks to recover these damages in an amount in excess of $75,000.

325.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Jasvinder Kaur.

326.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

327.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

328.    As Personal Representative of Jasvinder Kaur's Estate, Jaspreet Sekhon seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

329.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

330.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

331.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

## TWELVTH CAUSE OF ACTION
### (Wrongful Death in re: Public Nuisance—All Defendants)
### Jaspreet Sekhon, as personal representative of the Estate of Jasvinder Kaur

332.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

333.    Plaintiff Jaspreet Sekhon brings this claim as Personal Representative of the Estate of Jasvinder Kaur, deceased.

334.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

335.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

336.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

337.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

338.    As a result of the Attack, Jasvinder Kaur suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

339.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

340.    Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of Jasvinder Kaur's injuries and death.

341.    As a result of Defendants' negligence, Jasvinder Kaur suffered fatal injuries, and her Estate incurred medical bills, funeral and burial expenses, the costs of administering the Estate, and her surviving family members suffered the loss of love, care, and affection of Jasvinder Kaur. Jaspreet Sekhon, as Personal Representative of the Estate of Jasvinder Kaur, now seeks to recover these damages in an amount in excess of $75,000

342.    Defendants conduct was carried out with reckless, willful, and conscious disregard

for the safety of the public, including Jasvinder Kaur.

343.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

344.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

345.    As Personal Representative of Jasvinder Kaur's Estate, Jaspreet Sekhon seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

346.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

347.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

348.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

### THIRTEENTH CAUSE OF ACTION
#### (Negligence—All Defendants)
**Mary "Carol" Weisert, as personal representative of the Estate of John Weisert**

349.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

350.    Plaintiff Mary "Carol" Weisert brings this claim as Personal Representative of the Estate of John Weisert, deceased.

351.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

352.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

353.     Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

354.     Instead, upon information and belief, Defendants' negligent conduct channeled the Magazine into the hands of the Shooter.

355.     It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis- used in incidents like the Attack.

356.     This is precisely what occurred in this case.

357.     Defendants' negligence is an actual and proximate or legal cause of John Weisert's injuries.

358.     As a further actual and proximate legal result of Defendants' negligence, John Weisert suffered fatal injuries which proximately caused his death, his Estate incurred medical bills, funeral and burial expenses, his wife and children have suffered a loss of earnings of John, a loss of support, services, society, care, love and affection and acts of kindness of John as provided by Ind. Code 34-23-1-1. Mary "Carol" Wisert, as Personal Representative of the Estate of John Weisert, now seeks to recover these damages in an amount in excess of $75,000.

359.     Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including John Weisert.

360.     Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

361.     Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

362.     As Personal Representative of John Weisert's Estate, Mary "Carol" Weisert seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

363.     The actions of Defendants have forced Plaintiff to retain counsel to represent her in the prosecution of this action, and she is therefore entitled to an award of a reasonable amount

as attorney's fees and costs of suit.

## FOURTEENTH CAUSE OF ACTION
### (Wrongful Death—All Defendants)
### Mary "Carol" Weisert, as personal representative of the Estate of John Weisert

364.    Plaintiff incorporates by reference paragraphs 1 through 150 in this complaint as if restated fully herein.

365.    Plaintiff Mary "Carol" Weisert, as the Personal Representative of John Weisert's Estate brings this cause of action and alleges that Defendants' negligence is a legal and/or proximate cause of John Weisert's death.

366.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

367.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

368.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

369.    Instead, upon information and belief, Defendants' negligent conduct directly channeled the Magazine into the hands of the Shooter.

370.    It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis- used in incidents like the Attack.

371.    This is precisely what occurred in this case.

372.    Thus, Defendants' negligent and unlawful conduct directly  and proximately caused Plaintiff's harm.

373.    As a further actual and proximate legal result of Defendants' negligence, John Weisert suffered fatal injuries which proximately caused his death, his Estate incurred medical bills, funeral and burial expenses, his wife and children have suffered a loss of earnings of John, a loss of support, services, society, care, love and affection and acts of kindness of John as provided by

47

Ind. Code 34-23-1-1. Mary "Carol" Wisert, as Personal Representative of the Estate of John Weisert, now seeks to recover these damages in an amount in excess of $75,000.

374.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including John Weisert.

375.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

376.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

377.    As Personal Representative of John Weisert's Estate, Mary "Carol" Weisert seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

378.    The actions of Defendants have forced Plaintiff to retain counsel to represent her in the prosecution of this action, and she is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

### FIFTEENTH CAUSE OF ACTION
**(Public Nuisance—All Defendants)**
**Mary "Carol" Weisert, as personal representative of the Estate of John Weisert**

379.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

380.    Plaintiff Mary "Carol" Weisert brings this claim as Personal Representative of the Estate of John Weisert.

381.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

382.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

383.    A public nuisance is actionable by a private person where that person has suffered

special injury beyond that suffered by the community at large.

384.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

385.    As a result of the Attack, John Weisert suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

386.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

387.    As a further actual and proximate legal result of Defendants' nuisance, negligence, and wrongful acts, John Weisert suffered fatal injuries which proximately caused his death, his Estate incurred medical bills, funeral and burial expenses, his wife and children have suffered a loss of earnings of John, a loss of support, services, society, care, love and affection and acts of kindness of John as provided by Ind. Code 34-23-1-1. Mary "Carol" Wisert, as Personal Representative of the Estate of John Weisert, now seeks to recover these damages in an amount in excess of $75,000.

388.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including John Weisert.

389.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

390.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

391.    As Personal Representative of John Weisert's Estate, Mary "Carol" Weisert seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

392.    The actions of Defendants have forced Plaintiff to retain counsel to represent her in the prosecution of this action, and she is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

393.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

394.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing

public nuisance.

### SIXTEENTH CAUSE OF ACTION
#### (Wrongful Death in re: Public Nuisance—All Defendants)
#### Mary "Carol" Weisert, as personal representative of the Estate of John Weisert

395.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

396.    Plaintiff Mary "Carol" Weisert brings this cause of action as the Personal Representative of the Estate of John Weisert, deceased.

397.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

398.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

399.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

400.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

401.    As a result of the Attack, John Weisert suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

402.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

403.    Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of John Weisert's injuries and death.

404.    As a further actual and proximate legal result of Defendants' nuisance, negligence, and wrongful acts, John Weisert suffered fatal injuries which proximally caused his death, his Estate incurred medical bills, funeral and burial expenses, his wife and children have suffered a loss of earnings of John, a loss of support, services, society, care, love and affection and acts of kindness of John as provided by Ind. Code 34-23-1-1. Mary "Carol" Wisert, as Personal

Representative of the Estate of John Weisert, now seeks to recover these damages in an amount in excess of $75,000.

405.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including John Weisert.

406.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

407.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

408.    As Personal Representative of John Weisert's Estate, Mary "Carol" Weisert seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

409.    The actions of Defendants have forced Plaintiff to retain counsel to represent her in the prosecution of this action, and she is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

410.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

411.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

### SEVENTEENTH CAUSE OF ACTION
**(Negligence—All Defendants)**
**Matthew D. Alexander, as personal representative of the Estate of Karlie Smith**

412.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

413.    Plaintiff Matthew D. Alexander brings this claim as the natural father and next friend of Karlie Smith, deceased pursuant to Indiana's Child Wrongful Death Act.

414.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

415.    All Defendants violated one or more aspects of this duty by placing an

unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

416.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

417.    Instead, upon information and belief, Defendants' negligent conduct channeled the Magazine into the hands of the Shooter.

418.    It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis- used in incidents like the Attack.

419.    This is precisely what occurred in this case.

420.    Defendants' negligence is an actual and proximate or legal cause of Karlie Smith's injuries and death.

421.    As a direct and proximate result of the Defendants' negligence, Matthew D. Alexander was deprived of the love and companionship of his daughter, Karlie Smith, and incurred medical expenses, funeral expenses, and burial expenses, and now seeks to recover these damages under Indiana's Child Wrongful Death Act in an amount in excess of $75,000.

422.    Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Karlie Smith.

423.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

424.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

425.    As the father and next friend of Karlie Smith, deceased, Matthew D. Alexander seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

426.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount

as attorney's fees and costs of suit.

## EITHTEENTH CAUSE OF ACTION
### (Wrongful Death—All Defendants)
### Matthew D. Alexander, as personal representative of the Estate of Karlie Smith

427.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

428.    Plaintiff Matthew D. Alexander, as the natural father and next friend of Karlie Smith, deceased brings this cause of action under Indiana's Child Wrongful Death Act and alleges that Defendants' negligence is a legal and/or proximate cause of Karlie Smith's death.

429.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

430.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

431.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

432.    Instead, upon information and belief, Defendants' negligent conduct directly channeled the Magazine into the hands of the Shooter.

433.    It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being misused in incidents like the Attack.

434.    This is precisely what occurred in this case.

435.    Thus, Defendants' negligent and unlawful conduct directly  and proximately caused Plaintiff's harm.

436.    Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of Karlie Smith's injuries and death.

437.    As a direct and proximate result of the Defendants' negligence, Matthew D.

Alexander was deprived of the love and companionship of his daughter, Karlie Smith, and incurred medical expenses, funeral expenses, and burial expenses, and now seeks to recover these damages under Indiana's Child Wrongful Death Act in an amount in excess of $75,000.

438.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Karlie Smith.

439.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

440.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

441.    As the father and next friend of Karlie Smith, deceased, Matthew D. Alexander seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

442.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

### NINTENTH CAUSE OF ACTION
**(Public Nuisance—All Defendants)**
**Matthew D. Alexander, as personal representative of the Estate of Karlie Smith**

443.    Plaintiff incorporates by reference paragraphs 1 through 150 in this complaint as if restated fully herein.

444.    Plaintiff Matthew D. Alexander brings this cause of action as the natural father and next friend of Karlie Smith, deceased.

445.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

446.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

447.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

448.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

449.    As a result of the Attack, Karlie Smith suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

450.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

451.    Defendants' nuisance, negligence, and/or wrongful acts was the actual and proximate or legal cause of Karlie Smith's injuries and death.

452.    As a direct and proximate result of the Defendants' nuisance and negligence, Matthew D. Alexander was deprived of the love and companionship of his daughter, Karlie Smith, and incurred medical expenses, funeral expenses, and burial expenses, and now seeks to recover these damages under Indiana's Child Wrongful Death Act in an amount in excess of $75,000.

453.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Karlie Smith.

454.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

455.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

456.    As the father and next friend of Karlie Smith, deceased, Matthew D. Alexander seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

457.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

458.    Upon information and belief, Defendants have not reformed their reckless practices

in any way since the Attack.

459.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

## TWENTIETH CAUSE OF ACTION
### (Wrongful Death in re: Public Nuisance—All Defendants)
**Matthew D. Alexander, as personal representative of the Estate of Karlie Smith**

460.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

461.    Plaintiff Matthew D. Alexander brings this cause of action as the natural father and next friend of Karlie Smith, deceased.

462.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

463.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

464.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

465.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality  of mass shootings like the Attack.

466.    As a result of the Attack, Karlie Smith suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

467.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

468.    Defendants' nuisance, negligence, and/or wrongful acts was the actual and proximate or legal cause of Karlie Smith's injuries and death.

469.    As a direct and proximate result of the Defendants' nuisance and negligence, Matthew D. Alexander was deprived of the love and companionship of his daughter, Karlie Smith, and incurred medical expenses, funeral expenses, and burial expenses, and now seeks to recover these damages under Indiana's

Child Wrongful Death Act in an amount in excess of $75,000.

470.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Karlie Smith.

471.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

472.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

473.    As the father and next friend of Karlie Smith, deceased, Matthew D. Alexander seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

474.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

475.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

476.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

## TWENTY-FIRST CAUSE OF ACTION
### (Negligence—All Defendants)
### Jeff and Tammi Blackwell, as personal representative of the Estate of Samaria Blackwell

477.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

478.    Plaintiffs Jeff and Tammi Blackwell, as the natural parents and next friends of Samaria Blackwell, deceased brings this cause of action under Indiana's Child Wrongful Death Act and alleges that Defendants' negligence is a legal and/or proximate cause of Samaria Blackwell's death.

479.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

480. All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

481. Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

482. Instead, upon information and belief, Defendants' negligent conduct channeled the Magazine into the hands of the Shooter.

483. It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being mis- used in incidents like the Attack.

484. This is precisely what occurred in this case.

485. Defendants' negligence is an actual and proximate or legal cause of Samaria Blackwell's injuries and death.

486. As a direct and proximate result of the Defendants' negligence, Jeff and Tammi Blackwell were deprived of the love and companionship of their daughter, Samaria Blackwell, and incurred medical expenses, funeral expenses, and burial expenses, and now seeks to recover these damages under Indiana's Child Wrongful Death Act in an amount in excess of $75,000.

487. Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Samaria Blackwell.

488. Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

489. Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

490. As the natural parents and next friends of Samaria Blackwell, deceased, Jeff and Tammi Blackwell seek punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

491. The actions of Defendants have forced Plaintiffs to retain counsel to represent them

in the prosecution of this action, and they are therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

## TWENTY-SECOND CAUSE OF ACTION
### (Wrongful Death—All Defendants)
### Jeff and Tammi Blackwell, as personal representative of the Estate of Samaria Blackwell

492.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

493.    Plaintiffs Jeff and Tammi Blackwell, as the natural parents and next friends of Samaria Blackwell, deceased brings this cause of action under Indiana's Child Wrongful Death Act and alleges that Defendants' negligence is a legal and/or proximate cause of Samaria Blackwell's death.

494.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

495.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

496.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

497.    Instead, upon information and belief, Defendants' negligent conduct directly channeled the Magazine into the hands of the Shooter.

498.    It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being misused in incidents like the Attack.

499.    This is precisely what occurred in this case.

500.    Thus, Defendants' negligent and unlawful conduct directly  and proximately caused Plaintiffs' harm.

501.    Defendants' negligence and/or wrongful acts were the actual and proximate or legal cause of Samaria Blackwell's injuries and death.

502.     As a direct and proximate result of the Defendants' negligence, Jeff and Tammi Blackwell were deprived of the love and companionship of their daughter, Samaria Blackwell, and incurred medical expenses, funeral expenses, and burial expenses, and now seeks to recover these damages under Indiana's Child Wrongful Death Act in an amount in excess of $75,000.

503.     Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Samaria Blackwell.

504.     Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

505.     Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

506.     As the natural parents and next friends of Samaria Blackwell, deceased, Jeff and Tammi Blackwell seek punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

507.     The actions of Defendants have forced Plaintiff to retain counsel to represent them in the prosecution of this action, and they are therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

### TWENTY-THIRD CAUSE OF ACTION
**(Public Nuisance—All Defendants)**
**Jeff and Tammi Blackwell, as personal representative of the Estate of Samaria Blackwell**

508.     Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

509.     Plaintiffs Jeff and Tammi Blackwell brings this cause of action as the natural parents and next friends of Samaria Blackwell, deceased.

510.     All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

511.     A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring

60

the property, health, safety, or comfort of a considerable number of persons.

512.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

513.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

514.    As a result of the Attack, Samaria Blackwell suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

515.    Plaintiffs are entitled to recover damages in a claim sounding in public nuisance.

516.    As a direct and proximate result of the Defendants' nuisance and negligence, Jeff and Tammi Blackwell were deprived of the love and companionship of their daughter, Samaria Blackwell, and incurred medical expenses, funeral expenses, and burial expenses, and now seeks to recover these damages under Indiana's Child Wrongful Death Act in an amount in excess of $75,000.

517.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Samaria Blackwell.

518.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

519.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

520.    As the natural parents and next friends of Samaria Blackwell, deceased, Jeff and Tammi Blackwell seek punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

521.    The actions of Defendants have forced Plaintiff to retain counsel to rep- resent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

522.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

523.    As a result, Plaintiffs are also entitled to injunctive relief so as to abate an ongoing

public nuisance.

## TWENTY-FOURTH CAUSE OF ACTION
### (Wrongful Death in re: Public Nuisance—All Defendants)
### Jeff and Tammi Blackwell, as personal representative of the Estate of Samaria Blackwell

524.    Plaintiff incorporates by reference paragraphs 1 through 152 in this complaint as if restated fully herein.

525.    Plaintiffs Jeff and Tammi Blackwell bring this cause of action as the natural parents and next friends of Samaria Blackwell, deceased.

526.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

527.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

528.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

529.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

530.    As a result of the Attack, Samaria Blackwell suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

531.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

532.    Defendants' nuisance, negligence, and wrongful acts were the actual and proximate or legal cause of Samaria Blackwell's injuries and death.

533.    As a direct and proximate result of the Defendants' nuisance and negligence, Jeff and Tammi Blackwell were deprived of the love and companionship of their daughter, Samaria Blackwell, and incurred medical expenses, funeral expenses, and burial expenses, and now seeks to recover these damages under Indiana's Child Wrongful Death Act in an amount in excess of $75,000.

534.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Samaria Blackwell.

535.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

536.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

537.    As the natural parents and next friends of Samaria Blackwell, deceased, Jeff and Tammi Blackwell seek punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

538.    The actions of Defendants have forced Plaintiffs to retain counsel to represent them in the prosecution of this action, and they are therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

539.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

540.    As a result, Plaintiffs are also entitled to injunctive relief so as to abate an ongoing public nuisance.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, expressly reserve their right to amend this Complaint before or at the time of trial to insert those items of damage not yet fully ascertainable, demand judgment against all Defendants, and each of them, as follows:

1.  For general damages in an amount exceeding $75,000;

2.  For special damages in an amount exceeding $75,000;

3.  For punitive damages;

4.  For loss of earnings;

5.  For loss of consortium;

6.  For interest as provided by law;

7.  For all statutorily allowed damages;

8.  For applicable restitution;

9.  For an injunction requiring all Defendants to abate and/or cease contributing to the public nuisance they are creating in violation of one or more relevant statutes by unreasonably supplying 60-round HCM's like the Magazine to the public without public safeguards to prevent their nuisance;

10. For reasonable attorney fees and costs of suit incurred; and

11. For such other and further relief as this Court deems proper.

Respectfully submitted the 9th day of May, 2023.

*/s/Daniel S. Chamberlain*
Daniel S. Chamberlain
Indiana Bar No. 16375-49
Cohen & Malad, LLP
One Indiana Square, #1400
Indianapolis, IN 46204
dchamberlain@cohenandmalad.com

*/s/ Melvin L. Hewitt*
Melvin L. Hewitt
Georgia Bar No. 350319
Isenberg & Hewitt, PC
600 Embassy Row, #150
Atlanta, GA  30328
mel@isenberg-hewitt.com

*Attorneys for Plaintiffs*